### In re LATHROP, HASKINS & CO.

(District Court, S. D. New York. August, 1910.)

**1. BANKRUPTCY (§ 138*)—ASSETS—INTEREST OF BANKRUPT IN POOL—"PROPERTY."**

The interest of a bankrupt in a stock pool to advance the market in a certain stock and then sell to the public constituted "property," within the meaning of the bankruptcy act.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 138.*

For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

**2. WITNESSES (§ 196*)—QUESTIONS—REFUSAL TO ANSWER.**

The refusal of a witness to answer questions relevant to an inquiry in bankruptcy, because he owed to his customers and firm the duty not to disclose their private affairs, is unjustifiable.

[Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 196.*]

**3. BANKRUPTCY (§ 242*)—REFUSAL TO ANSWER QUESTIONS—RELEVANCY.**

A bankrupt was a member of a pool organized to deal in a certain stock to be managed by K. Prior to bankruptcy K. sold several thousand shares of pooled stock, which he had deposited with the witness' firm, together with large quantities of other securities, to secure advances for the benefit of the pool, under an arrangement that the witness might at any time sell for his own account such of K.'s securities as he wished. The pool stock having advanced to 90, witness testified that he began to be uneasy at K.'s refusal to sell, and thereupon determined to sell some of the stock for his own account, and did so to such an extent as to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

break the market and depress the price to 20, causing the bankruptcy in question. *Held,* that questions asked of the witness in the bankruptcy proceeding as to the market value of the property held by his firm for K. on the day he concluded to sell the stock, and as to whether he had purchased any similar stock to replace that he had used for delivery under the sales he had made, were calculated to inform the trustee whether any assets existed which should be collected, and hence the witness' refusal to answer the same, when ordered so to do by the referee, was contumacious.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 242.*]

In the matter of bankruptcy proceedings of Lathrop, Haskins & Co. On petition to review a referee's order directing one Popper to answer certain questions propounded to him at a meeting of creditors. Order affirmed, and witness punished for refusing to answer.

Abram I. Elkus and W. S. McGuire, for trustee.

Edward W. Hatch, for Popper, Sternbach & Co.

HOUGH, District Judge. It plainly appears from the evidence that the bankrupts were interested (with others) in what is commonly known as a "pool" in certain stock colloquially described as "Hocking Coal & Iron." The object of these joint adventurers was to control the market and advance the quoted price for said stock until such time as the public should become sufficiently interested therein to bid and pay a price satisfactory to the members of the pool. That the interest of the bankrupt in this business enterprise constituted property is not denied.

Another party interested in this scheme was Mr. Keene, who was the manager of the pool; that is to say, he seems to have directed the transactions, whether of buying or selling, in the pool stock which (in a manner to be stated) was under his control, for the benefit of himself and all others jointly interested. Mr. Keene's control over several thousand shares of this pooled stock in the early part of 1910 was of the following nature: The stock was deposited with Popper, Sternbach & Co., together with very large quantities of other securities, and against the entire mass of securities the firm last named had advanced large sums of money in a manner too familiar to require description in this city. Summarily stated, Popper, Sternbach & Co. were "carrying" the securities referred to for Mr. Keene.

Mr. Popper testifies that at the beginning of 1910 he grew uneasy at the refusal of Mr. Keene to sell any of this Hocking Coal & Iron stock. He was of opinion that, if the facts regarding Mr. Keene's account should "transpire," said account "would be in a very bad shape, and I would be compelled to call on him for a very large sum of money, and I wasn't certain whether I would get the amount of money that was necessary, or such securities as I could use."

Mr. Popper had done business with and for Mr. Keene for a considerable time, and when their business relations began (or at any rate long before the beginning of 1910) it had been agreed between them that Mr. Popper might at any time sell for his own account such of Mr. Keene's securities as he wished. As a method, therefore, of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

curing the difficulty above referred to, and arising from a difference of opinion between Messrs. Popper and Keene as to the disposition of the latter's securities, Mr. Popper concluded to sell some Hocking Coal & Iron, and he said:

"I thought there was very little risk, as we considered it, * * * in selling the stock at around the prices it was then selling at, which was about 87 or 88, so I commenced to sell some stock."

It is alleged (with what exact truth does not appear to me from the record) that the effect of these sales by Mr. Popper was to break the market, depress the nominal price of Hocking Coal & Iron from nearly 90 to 20, and produce with promptitude the bankruptcy of Lathrop, Haskins & Co. and others. The proceeds of Mr. Popper's sales were not paid to Mr. Keene. When Mr. Keene testified herein, on June 17, 1910, he did not know whether the stock so used by Mr. Popper had been replaced or not, and he states that he first found out that Mr. Popper or his firm had sold Hocking Coal & Iron for their own account about "the 23d of February," and the occasion of his finding it out was that:

"He [Mr. Popper] had to make under some subpœna a detailed account of his stock and what he had done with it."

In this condition of the testimony, and Mr. Popper being on the witness stand, he was asked in substance:

(1) As to the market value of the property held by Popper, Sternbach & Co. for Mr. Keene at the close of business on January 18th: i. e., the time, or approximate time, when Mr. Popper concluded that it was necessary to sell some of the said stock for his firm's account out of Keene's holdings; and

(2) As to whether he had purchased any Hocking Coal & Iron stock to replace that which he had used for delivery under the sales that he had made.

The object of these inquiries seems too plain to require comment. Both of these queries Mr. Popper refused to answer. He gave to the referee as a reason for such declination that he owed it to his "customers to refuse to give evidence in this proceeding concerning their private affairs or the private affairs of [his] firm." So far as this reason for the witness' action is concerned, I have nothing to add to what was held in Re Harriman (C. C.) 157 Fed. 440, and I do not understand that this ground of refusal is now asserted to be good.

It is, however, vigorously declared that no conceivable answers to the questions asked could be relevant to the "acts, conduct, or property" of the bankrupt, and therefore cannot be within the scope of any inquiry authorized by the bankruptcy statute. If it be (as it is) admitted that the bankrupts' interest in the pool property controlled by Mr. Keene and deposited with Mr. Popper was itself property, then every question tending to show why that property was lost, in what manner it was lost, who lost it, and who is responsible for such loss, is pertinent, relevant, and material. In this instance it is asserted that the bankrupts' property right was lost by Mr. Popper's

action, that such action was due to the exercise of his legal right as against Keene, that the reason for the exercise of that legal right was a distrust, not communicated to Mr. Keene, of the latter's willingness or ability to respond with money if the market went against him, and that the result of such exercise by Mr. Popper of his legal right was to lower the market, so that he could have replaced the stock he had himself sold at prices which would have shown a large profit to somebody. Query, whether to Mr. Popper or to Mr. Keene.

The transaction was most extraordinary, and, in my judgment, although it is true that these bankruptcy inquisitions are to be conducted only to enable creditors to discover whether the bankrupt is entitled to a discharge, and inform the trustee whether any assets exist which should be collected (In re Horgan & Slattery [2d Circuit] 3 Am. Bankr. Rep. 253, 98 Fed. 414, 39 C. C. A. 118), this is eminently an instance where "large latitude of inquiry should be allowed in the examination of persons closely connected with the bankrupt in business dealings." In re Foerst (D. C.) 1 Am. Bankr. Rep. 259, 93 Fed. 190.

I agree with the referee that the first inquiry is calculated to ascertain the accuracy of the statement by Mr. Popper in respect of the reasons moving him to make sales so disastrous in their results, and the second question is calculated to show whether anybody, and, if so, who, profited by the opportunities for gain presented by the transaction above outlined from the evidence.

It is admitted that in this matter there is no willful contempt. The ruling of the referee is therefore affirmed, and a nominal fine of $10 imposed upon Mr. Popper, for the use of the United States, and he is directed to answer the questions certified.